IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Robert Elliott Trucking, Inc. | ) | C/A No.: 9:11-cv-753 - RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Memorandum in Support of Plaintiff's** |
| | ) | **Motion for Class Certification** |
| Caterpillar, Inc. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TO THE DEFENDANT AND ITS ATTORNEYS:**

This is a product liability action brought by Robert Elliott Trucking ("RET"), on behalf of itself and all others similarly situated. The class complaint seeks redress for the purchase of defective truck engines, specifically ACERT C-13 and C-15 engines. The ACERT line of engines are manufactured by the Defendant at a single facility using a single process and a single design for the truck's exhaust mechanism known as a regeneration system. Then the engines are distributed across the United States including South Carolina.

The Complaint alleges that there is a uniform problem with the ACERT C-13 and C-15 engines. The problem is a defective regeneration system. The regeneration system employs a second combustion process designed to burn the exhaust particulates, thereby reducing exhaust mass. The failure of the regeneration system in the ACERT engines causes the trucks to shut down. Service records produced by RET indicate that the problems have been persistent and began soon after purchase of its vehicle. The

allegations contained in the Complaint, the facts known to the Plaintiff, and the limited amount of discovery exchanged all are in harmony with class treatment.

## Procedural History

Prior to filing this action, RET contacted the Defendant, notifying the Defendant of the defect in its ACERT C-13 engine and requesting the Defendant make it whole. Caterpillar refused. RET then retained counsel who again notified the Defendant and again requested the Defendant make it whole. Caterpillar refused again. During this period, RET became aware of other complaints filed against the Defendant for the same defect. An internet search revealed that not only were others having the same problem but CAT was refusing to appear at a trucking forum to address the issue. (Exhibit A) Additionally, contacts of RET in the industry acknowledged a uniform problem with this series of CAT engines, including an acknowledgement of the same when RET attempted to sell the vehicle. (Exhibit B)

Based upon this knowledge, RET filed a putative class action for all ACERT C-13 and C-15 owners in the state of South Carolina. The lawsuit was filed in Jasper County in Circuit Court. The Defendant immediately removed the action to Federal Court. In its removal, Defendant asserted (pg. 9, Notice of Removal) and reasserted (pg. 10, Notice of Removal) that exactly 1711 Caterpillar engines appeared to be in the class. (Exhibit C) This assertion by CAT established CAFA jurisdiction so clearly that RET elected to not contest the removal jurisdiction and consequently RET did not seek a hearing for remand where jurisdiction would have been challenged.[1]

---

[1] It is not disputed by either party that the value of an individual CAT ACERT C-13 engine is less than $75,000. CAT will not take a position that this engine alone is

Following removal, the parties had a Rule 26(f) telephone conference, as the rules require. During the 26(f) conference, the Defendant proposed a "bifurcated" discovery plan in which only "class discovery" could be sought prior to certification. The Plaintiff contested this approach, arguing that discovery targeting facts of the underlying case and discovery targeting class facts are intertwined and therefore discovery should proceed in full. While not conceding the point, RET even proposed a staged approach so that discovery could first target those areas which are known to be class concerns. This was not satisfactory to the Defendant. This resulted in each party submitting papers to the Court and the Defendant taking the position again that class facts and merits facts were somehow able to be separated from each other. The Court ultimately agreed to proceed as the Defendant requested.

The Defendant immediately served discovery on the entirety of the case including every aspect of Plaintiff's claims, not merely those aspects applicable to the propriety of class action. The Plaintiff served discovery trying to stay within the proper scope. (Exhibit D) The Defendant then noticed the 30b(6) deposition of the Plaintiff's company requesting deposition testimony on twenty-one different categories. (Exhibit E) Again, the Defendant made no distinction between merits and class, as it had argued was possible and necessary. Despite noting this in emails to counsel for the Defendant, Elliott produced a 30(b)(6) for this small company and attempted to address all areas.

After the Plaintiff received the Defendant's tardy responses to its narrowly tailored discovery, it discovered that the Defendant had not produced a single document. Nothing. (Exhibit F) Caterpillar even objected to producing documents for which it

---

worth more than this sum, leaving CAFA jurisdiction as the only true basis for federal jurisdiction.

3

relied upon in crafting its Notice of Removal, the content of which was the basis for the Plaintiff not opposing federal jurisdiction.  The Defendant provided one piece of unsupported information relevant to class definition or scope.  It stated that it estimated the class size to be 160.  This directly contradicted statements it has made in its earlier submissions to this Court.  As mentioned earlier, in order to justify removal pursuant to CAFA, CAT stated that the class consisted of 1711 (see Notice).  It has subsequently responded to discovery stating that the class consisted potentially of 160 CAT product owners in South Carolina.  Such wild disparity is inexplicable.  Plaintiff notified the Defendant by letter that the discovery responses were inadequate.  (Exhibit G)

This week, the Defendant has supplied two supplemental responses, which include two spreadsheets but no supporting documentation.  The list provided on September 21, 2011 lists 755 truck VIN numbers. (Exhibit H)  Who collected the information and how it was gathered is not known.  However, even without the Defendant's full cooperation in discovery, this Court can clearly determine that this matter is best suited for class treatment.

## Brief Factual History

RET is a small trucking operation residing in Jasper County, South Carolina.  It has been in operation for twenty eight years and prior to this action has never sued a product manufacturer.  The primary type of hauling done by RET is bulk hauling of wood byproducts and hauling lumber.  RET has a record of three decades of operating a profitable and responsible business.  As part of its practices, RET updates its fleet to make sure it is operating with the best available equipment.

In the fall of 2007, RET needed to purchase a tractor-trailer truck. Caterpillar deals in, among other things, industrial use truck engines. Caterpillar is a corporation organized and existing under the laws of Delaware and head quartered in Illinois. In 2007, the Defendant made available to customers the 2008 ACERT C-13 and C-15 engines. RET was one of the first to purchase this engine in South Carolina. (Exhibit I; Deposition of Jamie Curtis. Pg. 52, lines 3-19) The primary marketing thrust by the Defendant for the ACERT C-13 and C-15 engines has been that these engines offer "outstanding reliability" and are compliant with federal regulations passed in 2007. Despite knowledge of several suits and widespread complaints, Cat still maintains that these ACERT engines offer outstanding reliability (Exhibit J - printout).

The federal regulations which prompted the design change were passed to limit the amount of exhaust pollution tonnage admitted by heavy use trucks. The ACERT C-13 engine reduces the amount of tonnage of exhaust by passing all exhausts through a second combustion process. This type of exhaust system is known as a regeneration system. The second combustion process burns up various particulates that were found in the original exhausts thereby reducing the tonnage of exhaust emitted from the vehicle. The regeneration system is affixed to the primary engine. The design and manufacture coupling the regeneration system with the primary engine is done so that the primary engine cannot function without a properly functioning regeneration system. Regrettably, all of the significant experience and expertise that the Defendant possesses in producing reliable heavy use engines is now a nullity if its engineers have made a design or manufacturing error with the regeneration system. This is in fact what has happened.

The defendant has stated and continues to state on its website that a customer can expect a useful life of approximately 1,000,000 miles out of its engines. (Exhibit K - printout). When deposed, RET stated that it would expect comparable numbers for all trucks it purchased. (Exhibit L; Deposition of Jamie Curtis; Pg. 47, Lines 17-23). However, this truck engine has been subject to frequent shutdowns and has significantly less mileage than it should have at this point because it has not been able to be used in the normal fashion. (Exhibit M; Deposition of Jamie Curtis; Pg. 124, Lines 19-24).

The defendant is aware of the defective system. It sent a service letter to engine owners attempting to patch the defective system. (Exhibit N) While the service letter attempts to point a finger towards another manufacturer, it is clear that there is a single problem and it is being dealt with in a uniform fashion. This letter was not just sent to the Plaintiff but sent to all owners of ACERT engines in South Carolina and beyond. When it became apparent that the original warranty of twenty-four months would expire before RET would be able to sell the truck, RET contacted authorized agents of the Defendant and requested additional warranty coverage for the vehicle. CAT refused to provide the coverage without additional charge even though CAT was aware of the many problems that RET had experienced. Because of this, RET was forced to purchase an additional warranty knowing that repairs were a certainty and sale was not a viable option. (Exhibit O, Warranty)

The product, the process that manufactures the product, and the problems are all uniform.

**The Law and Argument**

Rule 23 of the Federal Rules of Civil Procedure defines those actions which

are best suited to effectively employ this procedural tool.  Rule 23 (a) provides:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

The first four criteria are often referred to as the requirements for numerosity, commonality, typicality and adequacy of representation.  This Court recently stated in Noel v. Hudd Distribution Services, Inc., 274 F.R.D. 187, 190 (D.S.C. 2011) that "the final three requirements of Rule 23(a) *'tend to merge,'* [so that] commonality and typicality '[serve] as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiffs claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' " citing Brown v. Nucor Corp., 576 F.3d 149, 152 (4th Cir.2009) (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir.1998)) (emphasis added).

In addition to criteria listed in 23(a) FRCP, a class must also qualify under one of the methods proscribed by section (b).  Although the Plaintiff contemplates amendment of the Complaint to include, among other things, the injunctive relief of a class wide extended warranty, at this writing, the class complaint merely requests

7

monitary or "(b)(3)" relief. While recently certifying a class of consumers, the Court in In re McKesson Governmental Entities Average Wholesale Price Litig., 767 F. Supp. 2d 263, 269 (D. Mass. 2011) recited the language of the rule:

> Plaintiffs seek to certify these classes pursuant to Rule 23(b)(3), which provides that an action may be maintained only if the Court also finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.
> Fed R. Civ. P. 23(b)(3).

A plain reading of the case as pled and the controlling law ends in understanding that class treatment is not merely justifiable but preferable for the Court. The discovered documents and known facts buttress and highlight the advantages of class treatment including that class treatment provides the Court with the most efficient, just, and expedient method of dealing with hundreds if not thousands of defective regeneration systems in South Carolina and beyond.

***Numerosity***

Professor Arthur Miller in, "An Overview of Federal Class Actions: Past, Present and Future," Federal Judicial Center Education & Training Series, (2d Ed. 1977) at 22, stated the following guideline as distilled from an exhaustive review of the cases on the numerosity requirement under Rule 23, Fed.R.Civ.Proc.:

"If the class has more than forty people in it, numerosity is satisfied; if the class has

less than twenty-five people in it, numerosity probably is lacking; if the class has between twenty-five and forty, there is no automatic rule and other factors, discussed below, become relevant."

Documents in the public forum, spreadsheets produced as recently as one day ago, filings in this Court and documents produced in discovery reveal that hundreds of South Carolina owners are affected by the defective ACERT engines. Under any test this sheer number evidences that joinder of all class members would be impracticable. Stemmermann v. Lilienthal, 54 S.C. 440, 32 S.E. 535 (1899); Grant v. Sullivan, 131 F.R.D. 436 (M.D.Pa. 1990) (14 class members ) see also, Arkansas Education Asso. v. Board of Education, 446 F.2d 763 (8th Cir.1971) (17 class members); Cypress v. Newport News General and Nonsectarian Hospital Ass=n, 375 F.2d 648 (4th Cir.1967) (18 class members); MacNeal v. Columbine Exploration Corp., 123 F.R.D. 181 (E.D.Pa.1988) (36 class members); Dameron v. Sinai Hospital, 595 F.Supp. 1404 (D.Md.1984) (25-30 class members); Pabon v. McIntosh, 546 F.Supp. 1328 (30-40 class members); National Gypsum v. Kirbyville Independent School District, 770 S.W.2d 621 (Tex.Civ.App.--Beaumont 1989) (67 class members); Republic National Bank of Dallas v. Denton & Anderson Co., 68 F.R.D. 208 (N.D.Tex.1975) (class in excess of 40 members met Anumerosity@ as a matter of law); Sharon Steel Corp. v. Chase Manhatten Bank, 88 F.R.D. 38 (S.D.N.Y.1980) (87 class members); Polich v. Burlington N, Inc., 116 F.R.D. 258 (D.Mont.1987) (60 class members).

CAT cannot dispute the large number of engines that documents that it has sold and referenced in filed documents. Even by it's own edited numbers, the total

amount of engines listed as relevant to inquiry was 755. By any standard, this makes numerosity a given.

### *A Predominance of Common Issues*

The commonality requirement of Rule 23 is not a stringent requirement. Rule 23, FRCP does not require that all issues of fact and law be common to class members. One common fact or issue is sufficient to satisfy this requirement if important enough. *Newberg, H.*, Newberg on Class Actions, 2d Ed., p. 154 (1985) (cases cited at p. 140-1). "When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all parties affected." Id at p.154. Nowhere does the rule require that all issues of fact and law be common. Accordingly, "the majority of decisions on the common question issue . . . have held that the presence of individual questions will not prevent satisfaction of the [Rule 23] requirements. Id, p. 159. In *Tatum v. R.J. Reynolds Tobacco Co.* 254 F.R.D. 59, 64 (M.D.N.C.,2008 ) the Court stated that the rule requires that there be questions of law or fact common to the class but that the rule "does not require that all, or even most issues be common." *citing Cent. Wesleyan*, 143 F.R.D. at 636, aff'd 6 F.3d 177 (4th Cir.1993); *Bussian v. DaimlerChrysler Corp.*, No. 1:04CV00387, 2007 WL 1752059, at *5 (M.D.N.C. June 18, 2007) (explaining that the test for commonality "is not demanding, and is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members"). In fact, "[t]he commonality requirement is relatively easy to satisfy." *Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 187 (D.Md.2003).

In <u>Stillmock v. Weis Markets, Inc.</u>, 385 F. App'x 267, 273 (4th Cir. 2010), a certified consumer class, the Fourth Circuit stated that "[r]ule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." The <u>Stillmock</u> court went, while citing <u>Smilow v. Southwestern Bell Mobile Systems, Inc.</u>, 323 F.3d 32 (1st Cir. 2003) that "the individuation of damages in a consumer class actions is rarely determinative under Rule 23(b)(3)." The protests that will likely be sounded by the Defendant of individual damages or individual variations of use do not mute the common strings found throughout this action. These objections are predictable and have been unsuccessful in recent actions filed in this Court. In <u>Brunson v. Louisiana-Pac. Corp.</u>, 266 F.R.D. 112, (D.S.C. 2010), the Plaintiffs asks the court to certify a class of purchasers of a defective product. Although the uses were not identical, and the maintenance of the material would necessarily vary, the core issues were common. The Court certified the class finding that the predominance requirement was met.

All questions of law and fact revolve around the singular issue that CAT's ACERT engines contain a known latent defect which causes the engines to shut down sporadically and makes the product unsuitable for its normal and foreseeable use. As a result, the market for these trucks is severely depleted and customers are subject to significant pressures to purchase an additional warranty at significant cost.

The inherent defect, the manufacturing materials and process which create the defect, and the problems which often manifest as a result of the defect are all the results of CAT's actions which are applicable and uniform to the entire class. The

11

common, over arching question which justifies certification is "Did CAT breach its duties to customers in the manufacture and sale of ACERT engines?" Examination of this question requires the Court to look at CAT processes which are applicable universally. It requires the Court to look at knowledge of the defendant concerning the defective product and that knowledge is identical for all class members. It requires the Court to look at product performance indicators that are applicable universally. It requires the Court to view the defendant's action in light of universally applicable standards, both governmental and industry. For warranty claims, the Court will examine the same or similar bodies of documents for all class members. Every way the situation is analyzed, class treatment is appropriate and superior to any other method.

The defect itself has been addressed by CAT not in single individual terms but in broadbrush attempts to various groups or subclasses. To date, RET is unaware of any documents and CAT has offered nothing which contradicts that its ACERT engines are defective. The evidence has established that RET's Acert C-13 engine never functioned properly and that widespread knowledge of the defect in CAT's engine destroyed any market value of the truck.

This central fact creates a host of secondary questions of law and fact which are all common to the class including:

1) CAT's decision to continue to market and manufacture the ACERT line which it knew or should have known would not perform as marketed

2) CAT's decision to continue to market and manufacture engines which it knew or should have known would not perform to industry standards

3) CAT's decision to continue to market and manufacture engines which

were not fit for their particular purpose

4) CAT's decision to continue to market and manufacture engines which were not fit for the customary and ordinary use

5) CAT's failure to adequately inform purchasers after it knew or should have known that its product had inherent deficiencies

6) CAT's deceptive practice of marketing the ACERT engine as a one million mile engine and making no distinction between ACERT engine performance and previous engine performance

7) CAT's failure to employ an adequate design despite knowledge that the current design had flaws

8) CAT's failure to adequately inform truck builders of the extra engine elements and specifications made necessary by its defective regeneration system.

9) CAT's failure to determine the common cause of the engine failures and therefore its inability to properly address the issue.

10) CAT's negligent act of continuing to market the product while at the same time it has abandoned manufacture of the same line.

11) CAT's practice of not offering the additional warranty free of charge to its customers despite knowledge of persistent problems with the engine.

Each of these questions is common to class members, and in each the relevant focus would be upon common breaches of duties by CAT. Each only highlights the core concept applicable to all that CAT manufactured, marketed, and sold engines which have a defect. That defect impacts the performance and necessarily the value of the product. That is what this case is about and that issue, and those which spin out from it, are common to all members of the plaintiff class and predominate over any single issues.

**Typicality**

The idea of typicality runs closely with the idea of commonality.  Echoing the sentiment found in this Court's ruling this year in <u>Noel</u>, *supra*, the Eastern District Court in Virginia has stated, "[t]he Rule 23(a) requirements of commonality and typicality tend to merge analytically. In general, commonality requires that there be "questions of law or fact common to the class," and typicality requires that "the claims or defenses of representative parties are typical of the claims or defenses of the class." *In re Mills Corp. Securities Litigation c* (E.D.Va.,2009)( citing *In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 524, 538 (E.D.Va.2006)* (citing *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

Deposition testimony and documents produced in discovery reveal RET sits as an average purchaser of an engine of this type, containing no special knowledge or status pertaining to these engines.  RET has no special relationship with the defendant.  RET's use of the product as a day haul truck for wood byproducts exerts no unique set of forces or circumstances which could not be accounted for by the defendant.  "A claim is typical if it arises from the same course of conduct that give rise to the claims of the class members and if the claims are based on the same legal theories.@ <u>Central Wesleyan College v. W. R. Grace & Co.</u>, 143 F.R.D. at 637.  This test does not require that the representatives have identical claims which other class members might present. The question of typicality [instead] focuses on the similarity of the legal and remedial theories of claims of the named and unnamed plaintiffs. <u>Bates v. Tenco Services, Inc.</u>, 132 F.R.D. 160, 163 (D.S.C. 1990).  Moreover, [t]ypicality is generally presumed when common questions exist. Newberg, *Newberg on Class Actions* at 165 (2d Ed.  1985).

14

***Adequacy of the Representatives and Adequacy of Counsel***

The 30(b)(6) testimony as well as the documents produced by RET reveal a responsible company that is capable of fairly and adequately representing the class.. It has entered into the status of class representative knowingly and with the advice of counsel of the duties which that role encompasses. As stated above, RET does not have any special relationship, personal or business, with the defendant.

RET has acted in accordance with the advice of its general counsel, A.G. Solomons, Jr. who has practiced law in South Carolina for 36 years. Mr. Solomons' practice has included appearances at every level of the Courts of South Carolina and in the Federal District Court of South Carolina. He has served as adviser to RET for the entirety of its existence. Winston A. Lawton, III has practiced law in South Carolina for 6 years. Mr. Lawton has extensive trial experience, serving first as a law clerk and then as an assistant solicitor in the Ninth Judicial Circuit of South Carolina.

A. G. Solomons III is class counsel for RET. Mr. Solomons is a partner with the firm Speights & Runyan. Mr. Solomons began his career as the law clerk for the Honorable Perry M. Buckner in 2000. After his time with Judge Buckner, he worked with Richardson, Plowden Carpenter & Robinson where he was engaged in both complex and general litigation. For ten years, Mr. Solomons' area of emphasis has been product liability actions both as a plaintiff and a defendant. He has litigated dozens of product liability actions at every level of the trial courts in South Carolina. Since joining Speights & Runyan six years ago, he has assisted Mr. Speights and Mr. Runyan in the prosecution of class actions in multiple states. Speights &

15

Runyan currently serves as class counsel for eight different certified class actions proceeding at various stages in different forums.   Mr. Solomons, and firm founder Daniel A. Speights[2], are serving, among others, as lead counsel in a consumer class which recently received MDL status.

Speights & Runyan has never participated in a coupon settlement class.  Quite to the contrary, the firm has a long history of securing sizeable individual claims in the context of class actions.  As an example, next week a Court is expected to approve final distribution of claims to class members in which a number of passive members of the class will receive awards in excess of $1,000,000.00.

Both the Plaintiff and its counsel are adequate to serve the needs of the class.  The applicable standard on this point is whether the plaintiff "has common interests with the unnamed members of the class" and will "vigorously prosecute the interests of the class." See Runion v. U.S. Shelter, 98 F.R.D. 313, 317 (D.S.C. 1983); Waller v. Seabrook Island Property Owners Association. 300 S.C. 465, 388 S.E.2d 799, 801 (1990)(citing Runion as a decision which "sets forth **all** criteria to be considered in determining whether a named plaintiff will adequately represent a proposed class.")(emphasis added).

***Superiority***

Despite requesting a list of all actions filed against the Defendant

---

[2] Mr. Speights has been a national leader in consumer and property class actions for over twenty five years.  After securing the nation's first property damage verdict against asbestos manufacturers, Mr. Speights engaged in litigation in more than 30 states.  His expertise and skill in bringing complex class actions to successful resolution have been commended by several Courts on record.

alleging deficiencies in the ACERT line of engines, such a list has not been produced nor any explanation given other than a boilerplate objection. However, in the slight amount of material that has been produced, the Defendant has acknowledged at least two other actions filed against CAT for ACERT C-13 deficiencies alone.[3] Judicial efficiency would be served by determining the issues on a class basis.

Proceeding as a class will minimize the costs to all class members. RET and its counsel have already spent a significant amount of money which frankly is not justifiable for a single engine case.

In both efficiency and fairness, proceeding as a class is superior to any other available method.

## Conclusion

The central driving inquiry in this action is whether or not the regeneration system on CAT's Acert line of engines was defective or did not meet the standards imposed by the uniform commercial code. All of the facts gathered in this inquiry will be common facts to a class of ACERT purchasers in South Carolina. As alluded to before, the class definition can be expanded, retracted, modified or removed if the development of the case so dictates. In fact, the current trend seems to be to ascertain whether the case can be advanced as a class and, if so, to certify the class as early as possible. Then, if facts change or dictate, to revisit and add subclasses or modify as is appropriate. At this stage, all of the known facts would

---

[3] Defendant does not concede that ACERT C-13 and C-15 customers should be in the same class and therefore has unilaterally imposed limitations on any discovery inquiry.

have the Court certify the action and be allowed to proceed to meaningful discovery.

For these reasons, RET asks this Court to certify a class of South Carolina customers who purchased ACERT C-13 and C-15 engines from the Defendant.

Respectfully Submitted,

   s\A. G. Solomons, III
A.G. Solomons, III
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC 29924
PH: (803) 943-4444
FAX: (803) 943-3319

A. G. Solomons, Jr.
Winston A. Lawton, III
SOLOMONS & LAWTON
P.O. Box 969
Estill, SC 29918
PH: (803) 625-3232
FAX: (803) 625-2148

September 23, 2011
Hampton, SC